FILED

07/24/2025

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 8, 2025 Session

**STATE OF TENNESSEE v. ANTWON DEJUAN WILEY**

**Appeal from the Circuit Court for Weakley County**
**No. 2023-CR-88     Jeff Parham, Judge**
_____

**No. W2024-01409-CCA-R3-CD**
_____

Following a trial, a Weakley County jury found Defendant, Antwon Dejuan Wiley, guilty of aggravated robbery and theft under $1,000, for which the trial court sentenced him to a total effective sentence of fifteen years' incarceration. On appeal, Defendant contends that the evidence is insufficient to support his conviction for aggravated robbery and that the trial court should have merged his conviction for theft under $1,000 with the aggravated robbery conviction based upon double jeopardy principles. Following a thorough review, we affirm Defendant's convictions and sentences but remand for the merger of his conviction for theft under $1,000 into his aggravated robbery conviction and entry of amended judgments reflecting the merger.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed;**
**Case Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and MATTHEW J. WILSON, JJ., joined.

Joshua V. Lehde (on appeal), Public Defender Fellow—Appellate Division; Bill Randolph, District Public Defender; and Martin E. Dunn and Jason Jackson (at trial), Assistant District Public Defenders, for the appellant, Antwon Dejuan Wiley.

Jonathan Skrmetti, Attorney General and Reporter; Ryan W. Davis, Assistant Attorney General; Colin Johnson, District Attorney General; and Kate Bynum and James R. Washburn, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

# I. Factual and Procedural Background

This appeal concerns a robbery that occurred inside a Dollar General store in Martin in February 2023, following which the Weakley County Grand Jury issued a two-count indictment charging Defendant with aggravated robbery, a Class B felony, and theft under $1,000, a Class A misdemeanor. The indictment alleged in Count 1 that, on February 22, 2023, Defendant:

> did unlawfully, feloniously and knowingly obtain and exercise control over approximately two hundred forty-seven dollars ($247.00) in U.S. currency from the person of Grace Chaney, an employee of Dollar General by violence and putting the said victim in fear by display of an article used and fashioned to lead the victim to reasonably believe it to be a deadly weapon, with intent to deprive the owner of property and without the owner's effective consent[.]

In Count 2, the indictment alleged that, on the same date, Defendant "did unlawfully and knowingly obtain and exercise control over approximately two hundred forty-seven dollars ($247.00) in U.S. currency, the property of Dollar General valued at one thousand dollars ($1,000) or less, with intent to deprive the owner of property and without the owner's effective consent[.]"

Defendant pleaded not guilty, and the case proceeded to trial. Grace Chaney testified that, on the evening of February 22, 2023, she was working at the Dollar General store located on Main Street across from Stanley Black & Decker in Martin. Ms. Chaney stated that her shift was from 4:00 or 4:30 p.m. until 10:15 p.m., when the store closed. She explained that she was a "key holder" and had access to the safes and the back office where the store computer was located and where she could access the store security cameras. She said that she was running the register and stocking shelves that night and that her assistant store manager was there as well.

Ms. Chaney testified that, around 8:15 p.m., a robbery occurred inside the store. She recalled that she was at the front of the store stocking shelves about twenty to thirty feet from the register. When she heard the store doors open, Ms. Chaney glanced that way and saw a masked man entering the store. The man approached her and told her to "go to the register" and "input the code." Ms. Chaney complied and then "took a step back, indicating for him to take what he wanted[.]" The man told her to hand him the money and to "include the five-dollar bills and the one-dollar bills." The masked man then instructed Ms. Chaney to lift the till out of the register "to check if there were any bigger bills underneath[,]" and she complied. Ms. Chaney recalled that, as the masked man exited the doors, he "took off towards the right towards a . . . residential side street." Before leaving

the store, the man told Ms. Chaney not to "tell the police or anybody else." After he left the store, however, Ms. Chaney informed the assistant manager that the store had been robbed, and they called the police. Ms. Chaney later determined that the man took $247 from the register. She testified that the man did not have consent to take the money and that the money was never recovered.

Ms. Chaney stated that the masked man was wearing a white t-shirt, a black jacket "partially zipped up" with an attached gray hood over the mask, dark blue sweatpants, and black boots. She said that the man was at least six feet tall and "a bit filled out." She indicated that the man was Black and had long dreadlocks that came to his "mid-chest." She said that "one or two dreads . . . were outside the mask and the hood, over his shoulder, in front of the white t-shirt."

Ms. Chaney said that, when the man walked into the store, he reached his left hand "towards his waist as if he was grabbing a handle of a weapon of some sort[.]" She said that she could not see what he was grabbing but stated that he was "making it out that he had something that could be used to threaten [her]." She said that she assumed the masked man had his hand on "some sort of firearm." The following exchange then took place:

> Q. What led you to make that assumption?
>
> A. Just the fact that it had -- kind of seemed like he had grabbed the handle, and at that angle that would be the most likely type of weapon that he could have been holding.
>
> Q. So the angle that he was holding it at his pocket --
>
> A. Yes.
>
> Q. -- led you to believe that it was a firearm?
>
> A. Yes.

Ms. Chaney testified that, at the time of the offense, she was eighteen years old and stood five foot three inches tall. Ms. Chaney said that she had "never been more terrified in [her] life" and that she was physically shaking during the incident. She said that she did not put up any type of resistance during the robbery, explaining that she felt like her "life was no longer in [her] hands at that point." Further, she explained that Dollar General instructed its employees to comply in the case of a robbery and, once the perpetrator leaves, "to lock the doors, notify a store manager, . . . and notify local authority."

Ms. Chaney testified that there were ten security cameras inside the store and that, after the police arrived, she reviewed security camera footage of the incident. She explained that, during the robbery, the man's dreadlocks, white shirt, and stature led her to believe he had been in the store earlier that night. She testified that he came into the store to purchase tobacco products and that he was wearing black basketball shorts, black boots, and a white t-shirt. She said that he was a Black man with long dreadlocks that reached his mid-chest. When shown security camera footage and still photographs of this individual, Ms. Chaney identified him as Defendant. She noted that the still photographs showed that Defendant entered the store at 8:09 p.m. She said that she was restocking cigarettes when Defendant came up to the register, paid for his purchase, and then left the store.

Ms. Chaney next identified photographs of the robbery suspect entering and leaving the store, whom she again described as wearing a white T-shirt, a black jacket with a gray hood, blue sweatpants, black boots, and a white clown mask. She stated that the robbery suspect had dreadlocks that reached mid-chest. She noted that the suspect held his left hand at his pocket or waistline. When she was asked if she could tell from looking at the security camera footage or the stills that the suspect was holding something, Ms. Chaney responded negatively. She said that the security camera footage showed that the robbery suspect entered the store at 8:22 p.m.

When asked what caused her to believe that the suspect had a gun, Ms. Chaney testified, "[H]e strictly held his left hand over that area and he sort of refused to move it until after we had kind of gotten behind the register." She noted that he was not moving the object but was "[j]ust holding his hand on it[.]" She said that she did not look directly at the object out of fear.

On cross-examination, Ms. Chaney read her written statement to investigators, as follows:

> The guy walked in wearing a clown type mask and holding on to some sort of handle in the pocket of a black jacket. He immediately called me over and told me to open the register and put in the code. He told me to hand him all the money, including the ones and fives. He then had me lift the drawer up to see if there were any bigger bills underneath. As he was leaving he told me not to call or tell anyone. He was a [B]lack male at least six-feet tall.

Ms. Chaney testified she made the determination that Defendant was the robbery suspect after she reviewed the security camera footage. She agreed that she also identified one other customer, who had been in the store an hour to an hour and a half before the robbery, as a possible suspect. She explained, however, that she made the statement about

- 4 -

the other customer before she reviewed the security camera footage. She described the other customer as a Black man, around six feet or taller, wearing a black shirt and black shorts or pants. She stated, however, that the other customer was "a lot more rotund" and "had a bigger build" than Defendant. She further stated that the other customer had dreadlocks but that they were, at most, shoulder length. Ms. Chaney testified that, after she reviewed the security camera footage, she did not believe the other customer was the robbery suspect.

Jason Arant testified that he was the site security manager for the Stanley Black & Decker plant, located directly across the street from the Dollar General store. He explained that the plant was comprised of four buildings and that he was responsible for "the overall safety of the site[.]" Mr. Arant explained that all employees were issued badges, which allowed them to get into the plant through turnstiles at the gates. He testified, "[W]ith the employee badge, there is a badge reader that's mounted to it. And to be able to access or activate that turnstile, to allow it to turn, the employee would have to scan their badge, and that unlocks it, and then the employees are able to walk in through the turnstile to give them access into the site." Mr. Arant testified that the plant had thirty-eight security cameras that were always recording. He explained that the security camera footage was stored on a server, and he was able to view the footage at any point.

Mr. Arant testified that he received a phone call on February 22, 2023, at 10:26 p.m. from Captain Eric Reid of the Martin Police Department (MPD). Captain Reid informed him that the Dollar General store directly across the street from the plant had been robbed. Captain Reid asked if the plant could share its security camera footage with the police department for its investigation. Mr. Arant, who was not on site at the time, told Captain Reid that he would provide a copy of the footage but that, as a corporate policy, Stanley Black & Decker required a subpoena. Mr. Arant received a subpoena for the security camera footage the next day.

Mr. Arant testified that, after Captain Reid's phone call, he received a call from the site's human resources manager, Joseph Clark, who said that investigators were on site at the plant reviewing security camera footage. Mr. Clark explained that the investigators believed the robbery suspect "was an employee who had come back from lunch break and was currently there at the plant working the assembly line." Mr. Clark asked if Mr. Arant could come to the plant and "possibly pull the suspect off the line so the investigators could speak with him[.]" Upon arriving at the plant, Mr. Arant spoke to Mr. Clark and MPD Investigator Kelly Hendon. Mr. Clark and Investigator Hendon had identified Defendant as the suspect and determined he was working the main assembly line.

Mr. Arant testified that Defendant worked the second shift—from 2:00 p.m. to 10:00 p.m.—and had a lunch break between 8:00 and 8:30 p.m. He said that the plant's security

camera footage from that night showed that Defendant used his employee badge to get into the plant, swiping it and going through the turnstile. Mr. Arant identified a still photograph from the footage showing Defendant's "getting ready to enter into the doors coming into HR hallway[.]" Mr. Arant said that he was able to identify the vehicle Defendant drove to work that day from the security camera footage; he stated it was a dark colored Kia Soul.

Mr. Arant next identified security camera footage of Defendant walking to his vehicle at 8:01 p.m. Mr. Arant narrated the footage, as follows:

> So he's entered his vehicle, and now he's exiting the parking lot. Industrial Park Drive runs north and south. So he's coming up to the stop sign there at the parking lot to enter onto Industrial Park Drive. And he's turning south onto Industrial Park Drive . . . which will tee into Main Street.

He explained that Defendant then backed his vehicle into the driveway of a residence "directly across the street from the Dollar Store there on Main Street."

Mr. Arant identified additional security camera footage that showed Defendant returning to the plant's parking lot at 8:31 p.m. He said that, after exiting his vehicle, Defendant walked across the parking lot back towards the HR entrance of the plant. Mr. Arant explained, however, Defendant did not have his badge upon his return and had to be "let in" to the plant. Mr. Arant testified that he and Mr. Clark went out to the line and asked Defendant to come to Mr. Clark's office to speak with them, and they escorted him to the office where Defendant spoke to Investigator Hendon.

Investigator Hendon testified that he responded to the Dollar General store after the robbery and spoke to Ms. Chaney, who reported that the suspect may have been in the store earlier that evening. Investigator Hendon reviewed the store's security camera footage with Ms. Chaney and obtained a still photograph of Defendant. Investigator Hendon explained that Defendant became a suspect in the robbery because "you could see dreads coming out of the clown mask and in front of the individual. This individual, whenever he walked in, had the exact same walk [as Defendant] and also had the dreads that you could see."

Investigator Hendon testified that he learned some employees from across the street at Stanley Black & Decker went on break at 8:00 p.m. He then spoke to Mr. Clark and showed him a picture of Defendant, and Mr. Clark confirmed that Defendant was "currently working on the line right now at [Stanley Black & Decker]." Investigator Hendon located Defendant's vehicle—a 2016 Kia Soul—in the plant's parking lot. He then obtained consent to search from Defendant's girlfriend, who was the owner of the vehicle. During a search, Investigator Hendon found a black jacket with a gray hood like

the one worn by the robbery suspect underneath the front passenger's seat. He also located a pair of navy-blue sweatpants, which appeared to match the pants worn by the suspect, "stuffed behind" a child's car seat in the back seat.

Investigator Hendon stated that, after reviewing the plant's security camera footage, he interviewed Defendant. He said that, although Defendant denied involvement in the robbery, he arrested Defendant that night. When asked why he arrested Defendant, Investigator Hendon replied:

> I viewed the footage, the initial footage from Dollar General, then I also viewed [Defendant] walking into the Dollar General prior to the incident, then we had [Mr.] Clark identify him as working there at Stanley Black & Decker, conducted an interview, he didn't admit to anything. But based off watching the way he walked, also finding the articles of clothing inside the vehicle that is seen there that he drives to work in.

On cross-examination, Investigator Hendon said that Defendant "had the same identifiers" as the masked suspect, who "had the dreads that came through the mask." He testified that the dreadlocks were "identical to [Defendant's] whenever he walked in prior" to the robbery. He further testified that Defendant "had a particular walk" and boots like the ones worn by the suspect. Investigator Hendon said that the area surrounding the Dollar General store was searched by officers and acknowledged that the clown mask, the weapon, and the $247 were never located. Investigator Hendon noted, however, that when he arrested Defendant, Defendant "did not have a wallet on him."

Following deliberations, the jury found Defendant guilty of aggravated robbery and theft under $1,000, as charged in the indictment. The trial court sentenced Defendant, as a Range II offender, to concurrent sentences of fifteen years for aggravated robbery and eleven months and twenty-nine days for theft under $1,000.

Defendant filed a timely motion for new trial and amended motion for new trial. Following a hearing, the trial court denied the motion in a written order. This timely appeal follows.

## II. Analysis

### *Sufficiency of the evidence*

Defendant contends that the evidence is insufficient to support his conviction for aggravated robbery. He asserts that his identity as the perpetrator was not proven beyond a reasonable doubt; further, he asserts that there was no evidence he possessed or threatened

to use a deadly weapon. The State responds that the evidence is sufficient to sustain Defendant's conviction for aggravated robbery. The State maintains that any rational jury could have concluded that Defendant was the perpetrator and that he possessed an article that caused the victim to reasonably fear he had a deadly weapon.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

The identity of the perpetrator is "an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006), *abrogated on other grounds by State v. Miller*, 638 S.W.3d 136 (Tenn. 2022). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." *Id.* (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). As charged in this case, aggravated robbery is defined as a robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-402(a)(1). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). A deadly weapon is a firearm or "[a]nything that in the

manner of its use or intended use is capable of causing death or serious bodily injury." Tenn. Code Ann. § 39-11-106(a)(6)(A)-(B) (2021).

"The aggravated robbery statute clearly contemplates the scenario in which a robbery is accomplished not by the brandishing of an actual deadly weapon but by some action on the part of the defendant to lead the victim to reasonably believe that the defendant is armed with a deadly weapon." *State v. Hale*, No. M2011-02138-CCA-R3-CD, 2012 WL 3776673, at *5 (Tenn. Crim. App. Aug. 31, 2012), *no perm. app. filed*. This court has previously observed that the "common threads" in cases where no actual deadly weapon is displayed "are: 1) a hand concealed in an article of clothing; and 2) a threat— express or implied—that caused the victim to 'reasonably believe' the offender had a deadly weapon and was not opposed to using it." *State v. Green*, No. M2003-02774-CCA-R3-CD, 2005 WL 1046800, at *10 (Tenn. Crim. App. May 5, 2005), *no perm. app. filed*. "The absence of a verbal threat of harm or statement indicating possession of a deadly weapon . . . is not automatically fatal to an aggravated robbery prosecution in which the weapon is not actually seen when the non-verbal evidence of deadly weapon possession is otherwise sufficient to support the conviction." *Hale*, 2012 WL 3776673, at *5 (citing *People v. Jolly*, 502 N.W.2d 177, 182 (Mich. 1993) ("The existence of some object, whether actually seen or obscured by clothing or something such as a paper bag, is objective evidence that a defendant possesses a dangerous weapon or an article used or fashioned to look like one. Related threats, whether verbal or gesticulatory, further support the existence of a weapon or article.")).

In this case, when viewed in the light most favorable to the State, the evidence is sufficient to support Defendant's conviction for aggravated robbery. The proof established that at 8:22 p.m. on the evening of February 22, 2023, Defendant entered the Dollar General store located on Main Street in Martin. Ms. Chaney, an employee of Dollar General, was working at the front of the store stocking shelves when she saw Defendant approaching her. Defendant had a clown mask over his face; he also had an object concealed in his clothing and was reaching his left hand "towards his waist as if he was grabbing a handle of a weapon of some sort[.]" Ms. Chaney testified that said that she did not know what the object was but that Defendant was "making it out that he had something that could be used to threaten [her]" and that she believed he had a firearm because "he had grabbed the handle . . . and at that angle that would be the most likely type of weapon that he could have been holding." Defendant approached Ms. Chaney and instructed her to "go to the register" and "input the code." When Ms. Chaney complied, Defendant told Ms. Chaney to hand him the money and to "include the five-dollar bills and the one-dollar bills." He then instructed Ms. Chaney to lift the till out of the register "to check if there were any bigger bills underneath." Ms. Chaney testified that she had "never been more terrified" and had felt like her "life was no longer in [her] hands" during her encounter with Defendant.

Defendant ultimately took $247 from the register, and Ms. Chaney testified that he did not have consent to take the money.

There was ample evidence establishing Defendant's identity as the masked perpetrator of the robbery, despite his claims to the contrary. Security camera footage from Dollar General and Stanley Black & Decker showed that Defendant was a Black man with long dreadlocks that fell to his mid-chest. Similarly, the security footage from Dollar General showed that the perpetrator was a Black man with dreadlocks down to his mid-chest area, and Investigator Hendon testified that Defendant's dreadlocks were "identical" to those worn by the perpetrator. Additionally, Investigator Hendon testified that Defendant "had a particular walk" and that the perpetrator "had the exact same walk" as Defendant. Moreover, before the robbery, Defendant was wearing a white T-shirt, black shorts, and black boots, and security camera footage showed that the perpetrator was also wearing a white T-shirt and black boots. Although the perpetrator additionally had on a black, zip-up jacket with a distinctive grey hood and navy-blue sweatpants, investigators found similar clothing hidden in Defendant's car after the robbery; they found the jacket under the passenger seat and the navy-blue sweatpants in the back seat, stuffed behind a child's car seat. From this evidence, any rational juror could conclude that the evidence established Defendant's identity as the perpetrator of the robbery.

The evidence also sufficiently supports the jury's finding that Defendant displayed an article in a manner fashioned to lead Ms. Chaney to reasonably believe he possessed a deadly weapon. The security camera footage viewed by the jury showed Defendant's placing his hand at his waistline on a handle coming from his jacket pocket, thereby confirming Ms. Chaney's testimony that Defendant had an object concealed in his clothing and was reaching his left hand "towards his waist as if he was grabbing a handle of a weapon of some sort[.]" In our view, Defendant's demand for money, accompanied by his wearing a clown mask over his face to disguise his identity and holding a hand on the handle of an object coming from his jacket pocket in a position that evoked the use of a firearm, led Ms. Chaney to reasonably believe that he had a deadly weapon and "was not opposed to using it." *Green*, 2005 WL 1046800, at *10; *see also Hale*, 2012 WL 3776673, at *5. He is not entitled to relief on this issue.

### *Merger*

Defendant asserts that his conviction for theft under $1,000 should be merged with his conviction for aggravated robbery, arguing that because theft is a lesser-included offense of aggravated robbery, his dual convictions violated double jeopardy. Defendant contends that the State's naming of two separate victims in the indictment "does not create two crimes out of a single taking of property." Further, he contends that, even if the State's attempt to identify Ms. Chaney and Dollar General as separate victims were legitimate, "it

failed to do so successfully" because the indictment refers to "Grace Chaney, an employee of Dollar General" as the victim of the aggravated robbery, and therefore, both counts name Dollar General as the victim.

The State responds that Defendant waived consideration of this issue by failing to raise it before the trial court and that Defendant has not established that he is entitled to relief via plain error.

To preserve his double jeopardy issue, Defendant had to raise it in his motion for new trial. *See State v. Harbison*, 539 S.W.3d 149, 164 (Tenn. 2018) (citing *State v. Bishop*, 431 S.W.3d 22, 43 (Tenn. 2014)); *see also* Tenn. R. App. P. 3(e). "Raising an issue in a motion for new trial allows the trial court to consider or reconsider the issue and make an appropriate ruling." *Id*. (citing *Fahey v. Eldridge*, 46 S.W.3d 138, 142 (Tenn. 2001)). Moreover, "[i]n a motion for new trial, the defendant must set forth the factual grounds on which he relies, the legal grounds for the trial court's ruling, and a concise statement as to why the trial court's decision was in error." *Id*. (citing *State v. Lowe-Kelley*, 380 S.W.3d 30, 33-34 (Tenn. 2012)). "Grounds not raised in a motion for new trial are waived for purposes of appeal." *Id*.

Defendant acknowledges in his reply brief that he did not raise a double jeopardy challenge or argue that his convictions should merge at any stage of the proceedings before the trial court, thereby waiving this issue. Nevertheless, "[w]hen necessary to do substantial justice," an appellate court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640-41; *see State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (formally adopting the *Adkisson* standard for plain error relief). Defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Defendant insists that this issue meets the five criteria set out in *Adkisson*, entitling him to relief via plain error. The State asserts, however, that Defendant is not entitled to plain error relief because no clear and unequivocal rule of law was breached by the trial

court's failure to merge Defendant's convictions.  We will begin our analysis with consideration of this factor.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, states, "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V.  Similarly, the Tennessee Constitution guarantees "[t]hat no person shall, for the same offense, be twice put in jeopardy of life or limb."  V Tenn. Const. art. I, § 10.  Both clauses provide three distinct protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012).

With respect to the third category, the double jeopardy prohibition operates to prevent prosecutors and courts from imposing punishment that exceeds that authorized by the legislature.  *Id*. at 542.  Such single prosecution, multiple punishment claims ordinarily fall into one of two categories: (1) "unit-of-prosecution" or (2) "multiple description" claims.  *Id*. at 543.  A unit-of-prosecution claim can arise when a defendant is convicted of multiple violations of the same statute.  *Id*.  The unit of prosecution for robbery is the number of thefts that occurred.  *State v. Franklin*, 130 S.W.3d 789, 798 (Tenn. Crim. App. 2003).  A multiple description claim can arise when a defendant is convicted of multiple criminal offenses under different statutes that punish the same act or transaction.  *Watkins*, 362 S.W.3d at 544.  This appeal involves a multiple description claim.

"The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932).  The *Blockburger* test, also called the same elements test, "requires an examination of the statutory elements in the abstract, without regard to the proof offered at trial in support of the offenses." *Watkins*, 362 S.W.3d at 544.  "The *Blockburger* test involves a two-step process."  *Id*. at 545.  The first step is to determine "whether the alleged statutory violations arise from the same act or transaction."  *Id*. (internal quotation marks omitted).  If the alleged violations did not arise from the same act or transaction, then there is no double jeopardy violation.  *Id*.  If the convictions did arise from the same act or transaction,

> the second step of the *Blockburger* test requires courts to examine the statutory elements of the offenses.  If the elements of the offenses are the same, or one offense is a lesser included of the other, then [courts] will presume that multiple convictions are not intended by the General Assembly and that multiple convictions violate double jeopardy.

*Id*. at 557.

Here, the State argues that, under the first step of the *Blockburger* analysis, Defendant's convictions do not arise from the same act or transaction because there were separate victims. The State asserts that Ms. Chaney was the victim of the aggravated robbery and that Dollar General was the victim of the theft. However, as noted by Defendant, the indictment in this case specifically names Ms. Chaney as a victim in her capacity as an employee of Dollar General. Ms. Chaney had custody and control of her employer's property at the time it was forcibly taken from her, and Defendant took none of Ms. Chaney's personal property. In other words, the robbery was a single transaction, the intention of which was to commit theft of Dollar General's property from its agent, Ms. Chaney.

Although the State insists that Defendant "could not have committed aggravated robbery against Dollar General, a corporate conglomerate," aggravated robbery convictions frequently arise where property belonging to a corporation is taken by use of a deadly weapon from a person who is an agent of the corporation. *See, e.g., State v. Franklin,* 130 S.W.3d 789, 797 (Tenn. Crim. App. 2003) (holding that the defendant committed a single theft from the corporation Amoco and, therefore, removing one aggravated robbery conviction despite the presence of two employees); *State v. Claybrooks*, 910 S.W.2d 868, 870 (Tenn. Crim. App. 1994) (upholding a single aggravated robbery conviction where defendant robbed a bank by holding a bank teller at gunpoint); *State v. Johnson*, 366 S.W.3d 150 (Tenn. Crim. App. 2011) (upholding a single aggravated robbery conviction where defendant stole merchandise and brandished a knife at an employee). Thus, under the first step of the *Blockburger* test, we conclude that the aggravated robbery and theft in this case arose from the same act or transaction and involved the same victim: Dollar General—through its agent, Ms. Chaney.

Turning to the second step of the *Blockburger* analysis, Defendant was convicted of aggravated robbery and theft. *See* Tenn. Code Ann. §§ 39-13-402, 39-14-103. Appellate courts "will presume that multiple convictions are not intended by the General Assembly" when the elements of the offenses are the same or when one offense is a lesser-included offense of the other. *Watkins*, 362 S.W.3d at 557. Theft is a lesser-included offense of robbery. *State v. Bowles*, 52 S.W. 3d 69, 79 (Tenn. 2001) ("It is uncontested that theft is a lesser-included offense of robbery."); *see also State v. Hayes*, 7 S.W.3d 52, 55-56 (Tenn. Crim. App. 1999). Accordingly, we conclude that Defendant's dual convictions for aggravated robbery and theft arising from the same event violate double jeopardy, and the failure to merge the convictions was a breach of a clear and unequivocal rule of law. *Adkisson*, 899 S.W.2d at 641; *see also State v. Jenkins*, No. E2017-01983-CCA-R3-CD, 2018 WL 6113468, at *13 (Tenn. Crim. App. Nov. 20, 2018) (determining that dual convictions for aggravated robbery and theft arising from the same event violated double

jeopardy because the offense of theft was "wholly incorporated into the offense of aggravated robbery" so the offenses were the "same" for the purposes of *Blockburger*), *no perm. app filed*.

Regarding the remaining *Adkisson* factors, the record clearly establishes what occurred in the trial court, and because dual convictions violate double jeopardy, a substantial right of the accused was adversely affected. *Adkisson*, 899 S.W.2d at 641. Moreover, Defendant gained no tactical advantage by failing to argue in the trial court that the convictions should merge. *Id*. Finally, we determine that rectifying dual convictions on Defendant's criminal record is necessary to do substantial justice. *Id*. at 642.

For these reasons, Defendant is entitled to relief as to this issue via plain error, and we remand this case to the trial court for the merger of his conviction for theft under $1,000 into his aggravated robbery conviction. Upon remand, the judgment of conviction for theft under $1,000 should indicate that it is merged into the conviction for aggravated robbery, and amended judgments should be entered reflecting merger. *See State v. Berry*, 503 S.W.3d 360, 364 (Tenn. 2015).

## III. Conclusion

Based upon the foregoing, we affirm Defendant's convictions and sentences but remand for the merger of the theft conviction into the aggravated robbery conviction and for entry of amended judgments of conviction.

s/*Robert L. Holloway, Jr.*

ROBERT L. HOLLOWAY, JR., JUDGE

- 14 -